**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 1:11-cv-23051-DLG

CHANEL, INC. and LOUIS VUITTON
MALLETIER, S.A.,

               Plaintiffs,

v.

ZHITIAN DAI *et al.*,

               Defendants.

_____/

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION**

      Plaintiffs submit this Memorandum in support of their *Ex Parte* Application for Entry of Temporary Restraining Order and Preliminary Injunction and Order Restraining Transfer of Assets Tied to the Counterfeiting Operation (the "*Ex Parte* Application for TRO").

**I.**      **INTRODUCTION**

      Plaintiffs, Chanel, Inc. ("Chanel") and Louis Vuitton Malletier, S.A. ("Louis Vuitton") (collectively "Plaintiffs"), are suing Defendants Zhitian Dai and Does 1-10 (collectively the "Defendants") for trademark counterfeiting and infringement and false designation of origin. The named Defendant and various unknown associates are promoting, advertising, distributing, offering for sale and selling products bearing counterfeits and infringement of Plaintiffs' respective trademarks within this District through the fully interactive commercial Internet websites operating under the domain names identified on Schedule A to Plaintiff's *Ex Parte* Application for TRO (the "Subject Domain Names"), filed herewith.[1]

_____

[1]  The domain names, fashionbootsforu.info, happyshoppingonline.info, nicegiftsforu.com, nicegiftsforu1.com, nicegiftsforu9.info, and oo8pp.tk, identified in Plaintiffs' Complaint, are operated by Defendants and include product categories for Chanel and Louis Vuitton. However, at the time of filing, the websites do not display pictures of the Chanel and Louis Vuitton

Defendants' unlawful activities have (1) deprived Plaintiffs of their right to determine the manner in which their respective trademarks are presented to the public; (2) defrauded the public into thinking Defendants' goods are valuable, authorized goods of Plaintiffs; (3) deceived the public as to Plaintiffs' sponsorship and/or association of Defendants' goods and websites; and (4) wrongfully traded and capitalized on Plaintiffs' respective reputations. Defendants should not be permitted to continue their unlawful activities.

Moreover, Plaintiffs recently obtained conclusive evidence that Defendant Dai uses money transfer services and accounts with The Western Union Company ("Western Union") and PayPal, Inc. ("PayPal") as methods to receive monies generated through the sale of counterfeit goods via the websites at issue. (See Declaration of Eric Rosaler in Support of Plaintiff's *Ex Parte* Application for TRO ["Rosaler Decl."] ¶¶ 5-6, 9, 11 filed herewith, and Comp. Exs. C, E, and G thereto.)  Plaintiffs seek to freeze the illegal profits generated by Defendants. In light of the inherently deceptive nature of the counterfeiting business, Plaintiffs have good reason to believe Defendants will hide or transfer their ill-gotten assets beyond the jurisdiction of this Court unless they are restrained. The Lanham Act allows Plaintiffs to recover the illegal profits gained through Defendants' distribution and sales of counterfeit and infringing goods. See 15 U.S.C. § 1117(a). To preserve that disgorgement remedy, Plaintiffs seek an *ex parte* order freezing Defendants' funds transmitted through Western Union and PayPal.

## II.     STATEMENT OF FACTS

### A.     Plaintiffs' Rights.

Chanel is the owner of all rights in and to the federally registered trademarks identified in

---

branded goods offered thereon.  Accordingly, Plaintiffs are only requesting immediate equitable relief as to the remaining fourteen (14) domain names identified in their *Ex Parte* Application.

Paragraph 5 of the Declaration of Adrienne Hahn Sisbarro in Support of Plaintiffs' *Ex Parte* Application for TRO ["Hahn Decl."], filed herewith (the "Chanel Marks"). <u>See also</u> United States Trademark Registrations for the Chanel Marks at issue attached as Comp. Ex. A to the Hahn Declaration.  Louis Vuitton is the owner of all rights in and to the federally registered trademarks identified in Paragraph 5 of the Declaration of Nikolay Livadkin in Support of Plaintiffs' *Ex Parte* Application for TRO ["Livadkin Decl."], filed herewith (the "Louis Vuitton Marks"). <u>See also</u> United States Trademark Registrations for the Louis Vuitton Marks at issue attached as Comp. Ex. A to the Livadkin Declaration.  The Chanel Marks and the Louis Vuitton Marks (collectively "Plaintiffs' Marks") are used in connection with the manufacture and distribution of, among other things, handbags, wallets, and sunglasses.  Plaintiffs' Marks are symbols of Plaintiffs' respective quality, reputations, and goodwill and have never been abandoned. (Hahn Decl. ¶¶ 6-7; Livadkin Decl. ¶¶ 6-7.)

Furthermore, Plaintiffs have each extensively used, advertised, and promoted their respective Marks in the United States in association with handbags, wallets, sunglasses, and related goods, and have carefully monitored and policed the use of their respective Marks. (Hahn Decl. ¶ 6; Livadkin Decl. ¶ 6.)  As a result of Plaintiffs' respective efforts, members of the consuming public readily identify products bearing Plaintiffs' Marks as being quality merchandise sponsored and approved by Plaintiffs. (<u>Id.</u> at ¶ 7.) Accordingly, Plaintiffs' Marks have achieved secondary meaning as identifiers of quality handbags, wallets, and sunglasses.

**B.      Defendants Wrongfully Use Plaintiffs' Trademarks.**

Defendants do not have the right or authority to use Plaintiffs' Marks for any purpose. (Hahn Decl. ¶ 9; Livadkin Decl. ¶ 9.)  However, Defendants are promoting and otherwise advertising, distributing, selling and/or offering for sale at least handbags, wallets, and sunglasses bearing exact copies of Plaintiffs' Marks ("Defendants' Goods"). (Hahn Decl. ¶¶ 11-

13; Livadkin Decl. ¶¶ 11-13; Rosaler Decl. ¶¶ 4, 7-8 and Comp. Exs. A, C, and D thereto; Declaration of Stephen M. Gaffigan in Support of Plaintiffs' *Ex Parte* Application for TRO ["Gaffigan Decl."] ¶¶ 2-5, filed herewith, and Comp. Exs. B and C attached thereto. See also relevant web pages from Defendants' Internet websites operating under the Subject Domain Names ("Defendants' Websites") attached as Comp. Ex. A to the Gaffigan Decl.)  Given Defendants' slavish copying, Defendants' Goods sold under identical marks are indistinguishable to consumers, both at the point of sale and post-sale.

Plaintiffs retained Eric Rosaler ("Rosaler") of AED Investigations, Inc.  (Hahn Decl. ¶ 10; Livadkin Decl. ¶ 10; Rosaler Decl. ¶ 3.) Rosaler accessed one of the Internet websites operated by Defendants, nicegiftsforu6.com, and placed an order for the purchase of a Chanel branded wallet, to be shipped to him in Aventura, Florida. (Rosaler Decl. ¶ 4 and Comp. Ex. A thereto.)  Rosaler finalized payment for the Chanel branded wallet via Western Union Financial Services, Inc. ("Western Union") to the payee, "ZHITIAN DAI" and was given a Money Transfer Control Number ("MTCN") of 357-057-5291. (Rosaler Decl. ¶ 6 and Comp. Ex. B thereto.)  Rosaler also accessed luxurybagsnow.com, and finalized a purchase via credit card for a Louis Vuitton branded wallet to be shipped to him in Aventura, Florida. (Rosaler Decl. ¶ 8 and Comp. Ex. D thereto.) Although Rosaler had paid via credit card, he sent an e-mail message to Defendants at sales@nicegiftsforu3.com, requesting information for finalizing his payment via PayPal, Inc. ("PayPal") for the Louis Vuitton branded wallet purchased using luxurybagsnow.com.  (Id. at ¶ 9 and Comp. Ex. E thereto.)  Shortly thereafter, Defendants directly responded to his e-mail via sales@nicegiftsforu3.com, expressly instructing Rosaler to make payment through PayPal to the PayPal account "xmleading2012@hotmail.com."  (Id.) Rosaler also inquired as to payment using Western Union, and was given instruction to deposit

payment into the account belonging to "Zhitian Dai, Xiamen City, Fujian Province, China 361009," which is the same payee account for his purchase of the Chanel branded wallet via nicegiftsforu6.com.   (Id. at ¶ 11 and Comp. Ex. G thereto.)   Indeed, in independent correspondence received from Defendants in regards to both of his purchases, Defendants offered Rosaler a ten percent discount if payment for the Chanel branded wallet purchased via nicegiftsforu6.com and payment for the Louis Vuitton branded wallet purchased via luxurybagsnow.com was effected using Western Union.  (Id. at ¶¶ 5, 11 and Comp. Exs. B and G thereto.)   Moreover, Defendants also admitted to being a related business with the Internet website operating under the Subject Domain, nicegiftsforu3.com.  (Id.)

Rosaler received the Chanel branded wallet he purchased from Defendants' nicegiftsforu6.com website and sent the same to Chanel, where the wallet was reviewed by Adrienne Hahn Sisbarro, who is familiar with Chanel's genuine goods and trained to detect counterfeits. (Rosaler Decl. ¶ 7 and Comp. Ex. C thereto; Hahn Decl. ¶¶ 3, 11.)  The web page listings of the Louis Vuitton branded wallet purchased by Rosaler from Defendants' luxurybagsnow.com website were sent to Louis Vuitton, and were reviewed by Nikolay Livadkin, who is familiar with Louis Vuitton's genuine goods and trained to detect counterfeits. (Rosaler Decl. ¶ 11; Livadkin Decl. ¶¶ 3, 11.)   Both Ms. Hahn Sisbarro and Mr. Livadkin determined the respective wallets to be non-genuine, counterfeit products. (Hahn Decl. ¶ 12; Livadkin Decl. ¶ 12.) Additionally, Ms. Hahn Sisbarro and Mr. Livadkin reviewed and visually inspected the items bearing the Plaintiffs' respective Marks offered for sale by Defendants via their Internet websites operating under the Subject Domain Names and determined the products were non-genuine products. (Id. at ¶ 13.)

Section 1127 of the Lanham Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Also, using the "ocular test" of direct comparison, courts have found that even marks which are slightly modified from the registered marks copied are to be considered counterfeit marks.  See Fimab-Finanziaria Maglificio vs. Helio Import/Export, Inc., 601 F. Supp. 1 (S.D. Fla. 1983).  A comparison of Plaintiffs' Marks at issue to the marks and designs used by Defendants in connection with the sale of Defendants' Goods reveals the obvious counterfeit infringing nature of Defendants' Goods. (Compare Chanel's Trademark Registrations [Comp. Ex. A to the Hahn Decl.] and Louis Vuittton's Trademark Registrations [Comp. Ex. A to the Livadkin Decl.] with Defendants' Websites [Comp. Ex. A to the Gaffigan Decl.] and Comp. Ex. C to the Rosaler Decl.)  Defendants' Goods are being promoted, advertised, sold, and offered for sale by Defendants within this District and throughout the United States. (Hahn Decl. ¶¶ 11-13; Livadkin Decl. ¶¶ 11-13; Rosaler Decl. ¶ 4; Gaffigan Decl. ¶¶ 2-5 and Defendants' Websites attached as Comp. Ex. A thereto.)  Defendants are making substantial sums of money by preying upon members of the general public, many of whom have no knowledge Defendants are defrauding them. Defendants are also falsely representing to consumers and the trade that their goods are genuine, authentic, endorsed, and authorized by Plaintiffs. Ultimately, Defendants' Internet websites amount to nothing more than massive illegal operations, infringing on the intellectual property rights of Plaintiffs and others. The Subject Domain Names themselves are a substantial part of the means by which Defendants further their scheme and cause harm to Plaintiffs.

## III.   ARGUMENT

### A.    A Temporary Restraining Order is Essential to Prevent Immediate Injury.

Rule 65(b) of the Federal Rules of Civil Procedure provides, in part, that a temporary

restraining order may be granted without written or oral notice to the opposing party or that party's counsel where "it clearly appears from the specific facts shown by affidavit . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition."  This is such a case.

Defendants herein fraudulently promote, advertise, sell, and offer for sale substantial quantities of goods bearing counterfeits of the Plaintiffs' Marks via their Internet websites operating under the Subject Domain Names. By their actions, Defendants are creating a false association in the minds of consumers between Defendants and Plaintiffs. Specifically, Defendants are wrongfully using counterfeits of Plaintiffs' Marks to increase traffic to their illegal websites. The entry of a temporary restraining order would serve to immediately stop Defendants from benefiting from their wrongful use of Plaintiffs' Marks and preserve the status quo until such time as a hearing can be held.  See Dell Inc. v. BelgiumDomains, LLC, Case No. 07-22674 2007 WL 6862341, at *2 (S.D. Fla. Nov. 21, 2007) (finding ex parte relief more compelling where Defendants' scheme "is in electronic form and subject to quick, easy, untraceable destruction by Defendants.").

In the absence of a temporary restraining order without notice, Defendants can and, based upon Plaintiffs' past experience, will significantly alter the status quo before the Court can determine the parties' respective rights. In particular, the Internet websites at issue are under Defendants complete control. Thus, Defendants have the ability to modify registration data and content, change hosts and, most importantly, redirect traffic to other websites they control. (Gaffigan Decl. ¶¶ 6-9.) Such modifications can literally happen in a short span of time after Defendants are provided with notice of this action. (Id.) Plaintiffs have learned through multiple prior cases that, upon notice of a lawsuit, counterfeit website owners typically immediately set

up a redirect which essentially informs a search engine that the website being crawled has permanently moved to another domain and instructs the search engine to divert traffic to the other website. (Id.)  In the circumstances present in this case, Defendants could use the redirect to push new traffic from the Subject Domain Names to new domains not yet identified in the Complaint. (Id.) The result would be to slingshot the new domains to the top of the search engine results pages by leveraging the current Internet traffic to the domains in suit which was built through the illegal use of Plaintiffs' Marks. (Id.) In short, Defendants would completely erase the status quo by transferring all of the benefits of their prior illegal activities to new websites. (Id.)

  **B.**  **Standard for Temporary Restraining Order and Preliminary Injunction.**

   In this Circuit, the standard for obtaining a temporary restraining order and the standard for obtaining a preliminary injunction are the same.  See Emerging Vision, Inc. v. Glachman, Case No. 10-cv-80734, 2010 WL 3293346, at *3 (S.D. Fla. June 29, 2010) (citing Siegel v. LePore, 120 F. Supp. 2d 1041 (S.D. Fla. 2000) aff'd 2000 WL 1781946 (11th Cir. 2000)).  In order to obtain a temporary restraining order or a preliminary injunction, a party must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005); see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of preliminary injunction and freezing of assets). Plaintiffs' evidence establishes all of the relevant factors.

   **1.**  **Probability of Success on the Merits of Plaintiffs' Claims.**

    **a)**  **Plaintiffs' are Likely to Succeed on Count I.**

   Title 15 U.S.C. §1114 provides liability for trademark infringement if, without the consent of the registrant, a defendant uses "in commerce any reproduction, counterfeit, copy, or

colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive." Plaintiffs must demonstrate (1) ownership of the trademarks at issue; (2) Defendants' use of the marks is without Plaintiffs' authorization; and (3) Defendants' use is likely to cause confusion, mistake, or deception as to the source, affiliation, or sponsorship of Defendants' Goods. <u>See</u> 15 U.S.C. § 1114(1). Plaintiffs' evidence submitted herewith satisfies the three requirements of 15 U.S.C. § 1114.

The first two elements of Plaintiffs' trademark infringement claim are easily met. Plaintiffs' respective Marks are owned by Plaintiffs and registered on the Principal Register of the United States Patent and Trademark Office, and all but one of the Chanel Marks have become "incontestable" under 15 U.S.C. §§ 1058 and 1065. (<u>See</u> Hahn Decl. ¶ 4 and Comp. Ex. A thereto, Chanel Trademark Registrations; Livadkin Decl. ¶ 4 and Comp. Ex. A thereto, Louis Vuitton Trademark Registrations.) <u>See also</u> <u>Ocean Bio-Chem, Inc. v. Turner Network Television, Inc.</u>, 741 F. Supp. 1546, 1554 (S.D. Fla. 1990) ("Incontestable status provides conclusive evidence of the registrant's exclusive right to use the registered mark, subject to §§ 15 and 33(b) of the Lanham Act."). Moreover, Defendants do not have, nor have they ever had, the right or authority to use Plaintiffs' Marks. (Hahn Decl. ¶ 9; Livadkin Decl. ¶ 9.)

The Eleventh Circuit uses a seven-factor test in determining the third element, likelihood of confusion. <u>See</u> <u>Ross Bicycles, Inc. v. Cycles USA, Inc</u>., 765 F.2d 1502, 1506 (11th Cir. 1985). These factors, as outlined in <u>Safeway Store, Inc. v. Safeway Discount Drugs, Inc.</u>, are: (1) the strength of the mark; (2) the similarity of marks; (3) the similarity of the goods; (4) similarity of the sales methods; (5) the similarity of advertising media; (6) defendants' intent; and (7) evidence of actual confusion. <u>See</u> 675 F.2d 1160, 1164 (11th Cir. 1982). The seven factors listed are to be weighed and balanced and no single factor is dispositive. (<u>Id</u>.)

**(1)      Strength of the Marks.**

A trademark's strength is determined by viewing the mark in its entirety as it appears in the marketplace. See Lone Star Steakhouse and Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 362 (11th Cir. 1997). The spectrum of protectability and strength for trademarks is divided into four primary types of designations: (1) coined, fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L.Ed.2d 615 (1992). Arbitrary or fanciful marks are the strongest and deemed inherently distinctive and entitled to protection. (See id.) It cannot be seriously disputed that Plaintiffs' Marks are strong, arbitrary and fanciful marks. (See Hahn Decl. ¶¶ 5-8 and Comp. Ex. A thereto, Chanel Trademark Registrations; Livadkin Decl. ¶¶ 5-8 and Comp. Ex. A thereto, Louis Vuitton Trademark Registrations.)

Plaintiffs' Marks have also acquired secondary meaning. Plaintiffs have each expended substantial time, labor, skill, and expense in developing, advertising, and promoting their respective Marks. (Hahn Decl. ¶¶ 6-7; Livadkin Decl. ¶¶ 6-7.) Plaintiffs' Marks enjoy widespread recognition and are prominent in the minds of consumers. (Id.) Indeed, products bearing Plaintiffs' Marks are among the best selling luxury goods in the United States. (Id.)

**(2)      Similarity of the Marks.**

Likelihood of confusion is greater when an infringer uses the exact trademark.  Turner Greenberg Assocs. v. C & C Imps., 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004).  Defendants are using marks which are identical to Plaintiffs' Marks. (Compare Plaintiffs' Trademarks Registrations [Comp. Ex. A to the Hahn Decl. and Comp. Ex. A to the Livadkin Decl.] with Defendants' Websites [Comp. Ex. A to the Gaffigan Decl.].)

10

### (3)    Similarity of the Goods.

"The greater the similarity between the products and services, the greater the likelihood of confusion." John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 976 (11th Cir. 1983). Defendants are selling the same types of goods Plaintiffs sell, i.e. handbags, wallets, and sunglasses. (Hahn Decl. ¶¶ 4-6; Livadkin Decl. ¶¶ 4-6; see generally Defendants' Websites attached as Comp. Ex. A to the Gaffigan Decl.) Because they bear counterfeits of Plaintiffs' Marks, Defendants' Goods appear virtually identical to Plaintiffs' respective genuine products in the consumer market. Standing alone, this similarity can be held sufficient to establish a likelihood of confusion. See John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 976 (11th Cir. 1983). However, Defendants' Goods are different in terms of quality.

### (4)    Similarity of Sales Method and (5) Advertising Method.

Convergent marketing channels increase the likelihood of confusion. See Turner Greenburg Assocs., 320 F. Supp. 2d at 1332. Both Plaintiffs and Defendants sell, distribute and advertise their products using at least one of the same marketing channels, the Internet, in the same geographical distribution areas within the United States, including Florida. (Hahn Decl. ¶¶ 5-6; Livadkin Decl. ¶¶ 5-6; Rosaler Decl. ¶ 4 and Comp. Ex. A thereto; see generally Defendants' Websites attached as Comp. Ex. A to the Gaffigan Decl.) Thus, the conditions of purchase for both parties are unmistakably identical. Moreover, both target the same general customers, and as such, Plaintiffs are directly competing with Defendants' products.

### (6)    Defendants' Intent.

In this District, it has been held that when an alleged infringer adopts a mark "with the intent of obtaining benefit from the plaintiff's business reputation, 'this fact alone may be sufficient to justify the inference that there is confusing similarity.'" Turner Greenberg Assocs.,

320 F. Supp. 2d at 1333, <u>citing</u> <u>Carnival Corp. v. Seaescape Casino Cruises, Inc.</u>, 74 F. Supp.2d 1261, 1268 (S.D. Fla. 1999).  In a case of clear-cut copying such as this, it is appropriate to infer Defendants intended to benefit from Plaintiffs' respective reputations, to the detriment of Plaintiffs. <u>See</u> <u>Playboy Enterprises, Inc. v. P.K. Sorren Export Co. Inc. of Florida</u>, 546 F. Supp. 987, 996 (S.D. Fla. 1982).  .

**(7)      Evidence of Actual Confusion.**

Actual confusion is unnecessary to establish infringement since the test is likelihood of confusion. <u>See</u> <u>Frehling Enters. v. Int'l Select Group, Inc.</u>, 192 F.3d 1330, 1340 (11th Cir. 1999). In this case, however, it is reasonable to infer actual confusion exists in the marketplace based upon the circumstantial evidence available. Defendants are advertising, offering to sell and selling counterfeit goods identical in appearance to those sold by Plaintiffs. (Hahn Decl. ¶¶ 4-6, 11-13 and Comp. Ex. A thereto; Livadkin Decl. ¶¶ 4-6, 11-13 and Comp. Ex. A thereto; Rosaler Decl. ¶ 4 and Comp. Ex. A thereto; and Defendants' Websites attached as Comp. Ex. A to the Gaffigan Decl.) Even if buyers are told of the bogus nature of Defendants' Goods, other consumers viewing Defendants' Goods in a post-sale setting will obviously be confused, because they are viewing goods bearing Plaintiffs' Marks which undeniably creates the impression they are viewing genuine goods sold or authorized by Plaintiffs.  Such post-sale confusion is entirely actionable. <u>See</u> <u>Remcraft Lighting Products, Inc. v. Maxim Lighting, Inc.</u>, 706 F. Supp. 855, 859 (S.D. Fla. 1989) ("The likelihood of confusion need not occur at wholesale level when the end user will be confused.").

It is abundantly clear the seven factors weigh overwhelmingly in Plaintiffs' favor. Plaintiffs have therefore shown a probability of success on the merits of Count I.

**b)      Plaintiffs are Likely to Succeed on Count II.**

As with a trademark infringement claim, the test for liability for false designation of

12

origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is also whether the public is likely to be deceived or confused by the similarity of the marks at issue. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 780, 112 S. Ct. 2753, 120 L.Ed.2d 615 (1992). Whether the violation is called infringement, unfair competition or false designation of origin, the test is identical -- is there a "likelihood of confusion?" Id. Therefore, because Plaintiffs have established the merits of their trademark counterfeiting and infringement claims against Defendants, a likelihood of success is also shown as to Plaintiffs' second claim for false designation of origin.

### 2.    Plaintiffs are Suffering Irreparable Injury.

As the Eleventh Circuit expressed it: "[A] sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of … [a] substantial threat of irreparable harm." Ferrellgas Ptnrs., L.P. v. Barrow, 143 Fed. Appx., 180, 191 (11th Cir. 2005) (citing McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998).  Such a finding of irreparable injury following a showing of likelihood of confusion is virtually always made in a case such as this, where Plaintiffs have demonstrated they will lose control of their respective reputations as a result of Defendants' activities.  Id. A likelihood of confusion exists herein because Defendants have engaged in counterfeiting activities using spurious designations indistinguishable from Plaintiffs' Marks.

### 3.    The Balance of Hardship Tips Sharply in Plaintiffs' Favor.

Plaintiffs have each expended substantial time, money and other resources to develop their respective quality, reputations, and goodwill associated with Plaintiffs' Marks. (Hahn Decl. ¶ 6; Livadkin Decl. ¶ 6.)  Should Defendants be permitted to continue their trade in counterfeit goods, Plaintiffs will suffer substantial losses and damage to their reputations. (See id. at ¶ 8.) However, Defendants will suffer no legitimate hardship in the event a temporary restraining order is issued, because Defendants have no right to engage in their present activities.

13

4.      **The Relief Sought Serves the Public Interest.**

Defendants are engaged in criminal activities and are directly defrauding the consuming public by palming off Defendants' Goods as genuine goods of Plaintiffs.  The public has an interest in not being misled as to the origin, source or sponsorship of trademarked products. See Nailtiques Cosmetic Corp. v. Salon Sciences, Corp., 1997 WL 244746, 5, 41 U.S.P.Q.2d 1995, 1999 (S.D. Fla.1997) ("The interests of the public in not being victimized and misled are important considerations in determining the propriety of granting injunctive relief.").

C.      **The Equitable Relief Sought is Appropriate.**

The Lanham Act authorizes courts to issue injunctive relief "according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark …" 15 U.S.C. § 1116(a).

1.      **Entry of an Order Immediately Enjoining Defendants' Unauthorized and Unlawful Use of Plaintiffs' Marks is Appropriate.**

Plaintiffs request an order requiring Defendants immediately cease all use of Plaintiffs' Marks, or substantially similar marks, including on or in connection with all Internet websites and domain names owned and operated, or controlled by them.  Such relief is necessary to stop the ongoing harm to Plaintiffs' respective trademarks and goodwill and to prevent Defendants from continuing to benefit from the increased traffic to their illegal website operations created by their unlawful use of Plaintiffs' Marks. Many courts have authorized immediate injunctive relief in cases involving the unauthorized use of trademarks.[2]

---

[2] See, e.g., Louis Vuitton Malletier, S.A. v. Chunqiu, Case 0:11-cv-60999-JEM (S.D. Fla. May 17, 2011) (Order granting Ex Parte Application for Temporary Restraining Order); Louis Vuitton Malletier, S.A. v. Feng, Case 11-cv-60811-DMM (S.D. Fla. April 25, 2011) (same); Louis Vuitton Malletier, S.A. v. Wang, Case 11-cv-60805-JIC (S.D. Fla. April 22, 2011) (same); Abercrombie & Fitch Trading Co. v. Li, Case 0:11-cv-60340-PCH (S.D. Fla. March 2, 2011) (same); Chanel, Inc. v. Li, Case 0:11-cv-60417-WPD (S.D. Fla. March 3, 2011) (same).

      **2.**     **Entry of an Order Prohibiting Transfer of the Domain Names During the Pendency of this Action is Appropriate.**

To preserve the status quo, Plaintiffs seek an order temporarily modifying control of and prohibiting Defendants from transferring the Subject Domain Names to other parties. Under the operating rules of domain name registrars, defendants involved in domain name litigation easily can, and often will, change the ownership of a domain name and thereby frustrate the court's ability to provide relief to the plaintiff. (Gaffigan Decl. ¶ 6.) Moreover, defendants can and often do modify website content to thwart discovery and redirect traffic to thwart effective injunctive relief. (Id. at ¶ 7.) Accordingly, to preserve the status quo and ensure the possibility of eventual effective relief, courts in trademark cases involving domain names regularly grant such relief.[3] Here, an interim order prohibiting Defendants from transferring the Subject Domain Names poses no burden on them, preserves the status quo, and ensures that this Court, after fully hearing the merits of this action, will be able to afford Plaintiffs full relief.

      **3.**     **Entry of an Order Modifying Control, Redirecting, and Disabling the Subject Domain Names is Appropriate.**

In domain name trademark cases, courts recognize that an interim order redirecting, transferring, disabling, or canceling the offending domain names often may be the only means of affording plaintiff interim relief that avoids irreparable harm.[4] Accordingly, in order to disable,

---

[3] See, e.g., Louis Vuitton Malletier, S.A. v. Feng, Case 11-cv-60811-DMM (S.D. Fla. April 25, 2011) (prohibiting Defendant from transferring domain names during pendency or until further Order of the Court); Louis Vuitton Malletier, S.A. v. Wang, Case 11-cv-60805-JIC (S.D. Fla. April 22, 2011) (same); Louis Vuitton Malletier, S.A. v. Li, Case 0:11-cv-60611-WPD (S.D. Fla March 28, 2011) (same).

[4] See e.g., Louis Vuitton Malletier, S.A. v. Chunqiu, Case 11-cv-60999-JEM (S.D. Fla. May 17, 2011) (ordering that the top-level domain (TLD) Registries for the domains change the registrar of record to a holding account with the United States based Registrar GoDaddy.com, Inc.; also ordering that the Registrar set the domains to redirect to plaintiff's publication website and thereafter placing domains on lock status, preventing the modification or deletion of the domains by the registrars or the defendants); Louis Vuitton Malletier, S.A. v. Feng, Case 11-cv-60811-DMM (S.D. Fla. April 25, 2011) (same); Louis Vuitton Malletier, S.A. v. Wang, Case 11-cv-60805-JIC (S.D. Fla. April 22, 2011) (same).

and redirect the Subject Domain Names, Plaintiffs request the Court enter an order requiring the Registries which maintain the Top Level Domain ("TLD") Zone files for the Subject Domain Names change the registrar of record for the Subject Domain Names to a holding account with the United States based Registrar GoDaddy.com, Inc., where they will be held in trust for the Court during the pendency of this action and set to automatically redirect to http://servingnotice.com/ZhitianDai/index.html.[5] Upon such redirection, a copy of all of the pleadings, other documents and Court orders issued in this matter will be immediately visible to Defendants the moment they type any of their own domain names into their web browser. The Subject Domain Names would remain in the legal ownership of Defendants, but they would no longer be able to display the infringing and counterfeit website content at issue in this matter. Rather, they would serve as the single most effective means of notifying Defendants of the pendency of this action and the relief sought by Plaintiffs and affording them and any other interested parties with an opportunity to present objections.

4.      An *Ex Parte* Order Restraining Transfer of Certain Assets Directly Related to the Counterfeiting Business is Appropriate.

In addition to an order temporarily restraining Defendants' practices, the Court should enter an order limiting the transfer of Defendants' unlawfully gained assets. Plaintiffs' have demonstrated above that they will likely succeed on the merits of their claims. As such, under 15 U.S.C. § 1117, Plaintiffs will be entitled to an accounting and payment of the profits earned by

---

[5] Such relief regarding a change of registrars was recently granted in Louis Vuitton Malletier, S.A. v. Chunqiu, Case 11-cv-60999-JEM (S.D. Fla. May 17, 2011); Abercrombie & Fitch Trading Co. v. Zhiyong, Case No. 0:11-CV-60913-JEM (S.D. Fla. May 4, 2011); Louis Vuitton Malletier, S.A. v. Feng, Case 11-cv-60811-DMM (S.D. Fla. April 25, 2011); Louis Vuitton Malletier, S.A. v. Wang, Case 11-cv-60805-JIC (S.D. Fla. April 22, 2011); Louis Vuitton Malletier, S.A. v. Li, Case 11-cv-60611-WPD (S.D. Fla. March 28, 2011); Chanel, Inc. v. Li, Case     11-cv-60417-WPD     (S.D.     Fla.     March     3,     2011).     (See http://servingnotice.com/chunqiu/index.html;     http://servingnotice.com/zhiyong/index.html; http://servingnotice.com/feng/index.html;     http://servingnotice.com/wang/index.html; http://servingnotice.com/li/index.html; http://servingnotice.com/li2/index.html.

Defendants throughout the course of their counterfeiting scheme. Due to the deceptive nature of the counterfeiting business, and Defendants' deliberate violation of the federal trademark laws, Plaintiffs respectfully request this court grant additional *ex parte* relief restraining the transfer of all monies held or received by Western Union and PayPal for the benefit of any one or more of the Defendants, specifically including Defendant Zhitian Dai. See International Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc., 80 F.3d 749 (2d Cir. 1996).

This Court has broad authority to grant such an order. The Supreme Court has provided that district courts have the power to grant preliminary injunctions to prevent a defendant from transferring assets in cases where an equitable interest is claimed. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 144 L. Ed. 2d 319, 119 S. Ct. 1961 (1999). Moreover, almost every Circuit has interpreted Rule 65 of the Federal Rules of Civil Procedure to grant authority to courts to freeze assets *pendente lite.* See Mason Tenders Dist. Council Pension Fund v. Messera, 1997 WL 223077 (S.D.N.Y. May 7, 1997) (acknowledging that "[a]lmost all the Circuit Courts have held that Rule 65 is available to freeze assets pendente lite under some set of circumstances").

In light of the illicit nature of the counterfeiting business, along with the ability of counterfeiters to practically eliminate their evidentiary trails by conducting their business entirely over the Internet, courts in the Eleventh Circuit, among others, have particularly noted the significance of such asset freezes in cases involving counterfeiting defendants. See e.g. Levi Strauss & Co. v. Sunrise Int'l Trading, 51 F.3d 982 (11th Cir. 1995); Reebok Int'l Ltd. v. Marnatech Enter., 737 F. Supp. 1515 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992). In Levi Strauss, the Eleventh Circuit upheld an order granting an asset freeze against an alleged counterfeiter where the complaint included a request for a permanent injunction and the

equitable remedy of disgorgement of the alleged counterfeiter's profits under 15 U.S.C. § 1117. Levi Strauss, 51 F.3d at 987. Distinguishing Levi Strauss from two earlier cases not involving Lanham Act claims, the Court emphasized the necessity of the freeze holding that a "request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." Id. citing Federal Trade Commission v. United States Oil and Gas Corp., 748 F.2d 1431, 1433-34 (11th Cir.1984) (district court may exercise its full range of equitable powers, including a preliminary asset freeze, to ensure that permanent equitable relief will be possible). Indeed, in recent cases in this District which are virtually identical to this matter, Courts have entered the precise relief sought herein. See e.g. Louis Vuitton Malletier, S.A. v. Chunqiu, Case No. 0:11-cv-60999-JEM (S.D. Fla. May 17, 2011) (Order granting TRO freezing the PayPal accounts tied to counterfeiting operation); Abercrombie & Fitch Trading Co. v. Zhiyong, Case No. 0:11-CV-60913-JEM (S.D. Fla. May 4, 2011) (same); Tiffany (NJ) LLC v. Zheng, Case No. 11-cv-60171-CMA (S.D. Fla. Feb. 11, 2011) (same); Louis Vuitton Malletier, S.A. v. Feng, Case No. 11-cv-60811-DMM (S.D. Fla. April 25, 2011) (Order restraining funds held or received by Western Union); Chanel, Inc. v. Li, Case No. 11-cv-60417-WPD (S.D. Fla. March 3, 2011) (same); see also Gaffigan Decl. ¶ 10 and Comp. Ex. F thereto.

Similarly, in Reebok v. Marnatech, the District Court granted Reebok a limited restraint of the defendants' assets for the purpose of preserving those assets, thus ensuring the availability of a meaningful accounting after trial. Reebok Int'l Ltd., 737 F. Supp. at 559. In affirming the decision, the Ninth Circuit determined that the plaintiff met its burden of demonstrating: (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their allegedly ill-gotten profits if

their assets were not frozen. <u>Reebok Int'l Ltd.</u>, 970 F.2d 552, 563 (9th Cir. 1992). Moreover the Court reasoned: "because the Lanham Act authorizes the District Court to grant Reebok an accounting of [Defendant's] profits as a form of final equitable relief, the District Court has the inherent power to freeze [Defendant's] assets in order to ensure the availability of that final relief." <u>Reebok Int'l Ltd.</u>, 970 F.2d. at 559; <u>see also</u>, <u>Republic of Philippines v. Marcos</u>, 862 F.2d 1355, 1364 (9th Cir. 1988), <u>cert. denied</u>, 490 U.S. 1035 (1989) ("[a] court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies").

Using the power to issue provisional remedies ancillary to their authority to provide final equitable relief, numerous courts have granted orders restraining defendants from transferring their assets under trademark infringement claims. <u>See e.g.</u>, <u>Levi Strauss</u>, 51 F.3d at 987; <u>Reebok Int'l Ltd.</u>, 970 F.2d at 559. <u>See also</u> <u>United States of America ex. rel. v. Rahman, M.D.</u>, 198 F.3d 489, at 498-99 at n.2 (4th Cir. 1999) (acknowledging that a district court has authority to freeze assets to satisfy an equitable award of profits in actions alleging trademark infringement); <u>Diane Von Furstenberg Studio v. Snyder</u>, Case No. 1:06-cv-1356, 2007 WL 3143690, at *2 (E.D. Va. Oct. 23, 2007) (upholding the restraint on alleged trademark infringer's assets).

Moreover, to provide complete equitable relief, courts have granted such orders without providing notice to the defendants. Specifically, federal courts have held that where advance notice of an asset freeze is likely to cause a party to alienate the assets sought to be frozen, a temporary restraining order may be issued *ex parte*. <u>See</u> <u>F.T. Int'l Ltd v. Mason</u>, 2000 WL 1514881 *3 (E.D. Pa. 2000) (granting *ex parte* TRO freezing defendants' bank accounts upon finding that advance notice would likely have caused the defendants to secret or alienate funds); <u>CSC Holdings, Inc. v. Greenleaf Elec., Inc.</u>, 2000 WL 715601 (N.D. Ill. 2000) (granting *ex parte*

TRO enjoining cable television pirates from selling illegal decoders and freezing pirates' business and personal assets).

In this case, Defendants' blatant violations of federal trademark laws warrant an *ex parte* order restraining the transfer of their ill-gotten assets.  Federal courts have long recognized that such elaborate schemes based entirely on illicit conduct justify proceeding on an *ex parte* basis. See generally Time Warner Enter. Co. v. Does #1-2, 876 F. Supp. 407, 410-11 (E.D.N.Y. 1994).[6] Moreover, as Defendants' business is conducted almost entirely over the Internet, Plaintiffs have additional cause for *ex parte* relief, as Defendants may easily secret or transfer their assets without the Court or Plaintiffs' knowledge.

### 5.    A Bond Should Secure the Injunction.

Because of the strong and unequivocal nature of Plaintiffs' evidence of counterfeiting and infringement, Plaintiffs respectfully request this Court require them to post a bond of no more than ten thousand dollars ($10,000.00), subject to modification based upon the actual monies ultimately restrained.

## IV.    CONCLUSION

In view of the foregoing, Plaintiffs respectfully request this Court enter a temporary restraining order in the form submitted herewith and set a preliminary injunction hearing.

DATED: August 31, 2011.                     Respectfully submitted,

                                            STEPHEN M. GAFFIGAN, P.A.

                                            By:   s:/smgaffigan/
                                               Stephen M. Gaffigan (Fla. Bar No. 025844)
                                               Virgilio Gigante (Fla. Bar No. 082635)
                                               401 East Las Olas Blvd., #130-453
                                               Ft. Lauderdale, Florida 33301

---

[6] See also Louis Vuitton Malletier, S.A. v. Chunqiu, Case 0:11-cv-60999-JEM (S.D. Fla. May 17, 2011); Abercrombie & Fitch Trading Co. v. Zhiyong, Case No. 0:11-CV-60913-JEM (S.D. Fla. May 4, 2011).

Telephone: (954) 767-4819
Facsimile: (954) 767-4821
E-mail: leo@smgpa.net
E-mail: stephen@smgpa.net

Attorneys for Plaintiffs CHANEL, INC. and
LOUIS VUITTON MALLETIER, S.A